Matthew J. Langley (SBN 342286)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: 773-554-9354
matt@almeidalawgroup.com

*Attorney for Plaintiffs & the Proposed Class*

**IN THE UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

NICK GAIGE, NATALIE GIANNE NICOLE SEIDLIN, *and* CASEY KASSAL *on behalf of themselves and all others similarly situated*,

Plaintiffs,

vs.

EXER HOLDING COMPANY, LLC,

Defendant.

Case No.: 2:24-cv-06099-SPG-AJR

**FIRST AMENDED CLASS ACTION COMPLAINT**

1. VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. SECTION 2511(1), *et seq.*;
2. VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE §§ 630, *et seq.*;
3. VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT, CAL. CIVIL CODE §§ 56, *et seq.*;
4. VIOLATION OF CAL. CONST. ART. 1 §1;
5. INVASION OF PRIVACY;
6. UNJUST ENRICHMENT.

**DEMAND FOR JURY TRIAL**

FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED AUGUST 2, 2024, D.E. #13

Plaintiffs Nick Gaige, Natalie Gianne, Nicole Seidlin and Casey Kassal ("Plaintiffs"),[1] bring this class action lawsuit on behalf of themselves, and all others similarly situated (the "Class Members") against Defendant Exer Holding Company, LLC ("Exer" or "Defendant") in their individual capacities and on behalf of all others similarly situated and allege, upon personal knowledge as to their own actions and their counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Information concerning a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can have serious consequences including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage.[2]

2. Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to any unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

---

[1] Plaintiffs file this Complaint under seal to protect their health information under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

[2] *See* Lindsey Ellefson, Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world, WIRED (Nov. 16, 2022) https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ (last visited Oct. 30, 2025) ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, Facebook Is Receiving Sensitive Medical Information from Hospital Websites, THE MARKUP (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited Oct. 30, 2025).

3. Plaintiffs bring this class action lawsuit to address Exer's illegal and widespread practice of disclosing its patients confidential personally identifiable information ("PII") and protected health information ("PHI", collectively referred to as "Private Information") to unauthorized third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta") and Google LLC ("Google").

4. Defendant operates, controls and manages over 61 clinics across the Los Angeles area.[3] Defendant owns and controls the website exerurgentcare.com and its webpages (the "Website").

5. Defendant's illegal privacy violations occurred and continue to occur because of the tracking technologies that it installed on its Website including, but not limited to, the Meta Pixel (the "Pixel"), Facebook SDK, Facebook Conversions API, Google Analytics, Google Tag Manager, DoubleClick (owned by Google), and related tools (collectively, "Tracking Technologies").[4]

6. The Tracking Technologies that Defendant used allowed unauthorized third parties to intercept the contents of patient communications, view patients' Private Information, mine it for purposes unrelated to the provision of healthcare, and further monetize it to deliver targeted advertisements to specific individuals.

7. Exer owns and controls the Website, which it encourages its patients to use to (i) book medical appointments, (ii) locate urgent care and primary care facilities, (iii) pay bills, (iv) research medical treatment options and (v) review information related to their medical health conditions.[5]

8. In doing so, and by designing its Website in the manner described throughout this First Amended Complaint, Exer knew or should have known that its

[3] *See* https://exerurgentcare.com/exer-locations/ (last visited Oct. 30, 2025).

[4] This First Amended Complaint contains images and evidence demonstrating the Meta Pixel was used on Defendant's Website, but Plaintiffs (without the benefit of discovery) do not have access to every tracking tool that was previously installed on the Website.

[5] https://exerurgentcare.com/medical-services/ (last accessed July 9, 2024).

patients would use the Website to communicate Private Information in conjunction with obtaining and receiving medical services.

9. Operating as designed and as implemented by Defendant, the Pixel allowed the Private Information that Plaintiffs and Class Members submitted to Defendant to be unlawfully disclosed to Facebook alongside their unique and persistent Facebook ID ("FID"), IP address, and other static identifiers in violation of HIPAA, state laws, industry standards, and patient expectations.

10. Simply put, the health information disclosed through the Tracking Technologies is personally identifiable.

11. By installing Tracking Technologies on its Website, Defendant effectively planted a bug in Plaintiffs' and Class Members' web browsers that caused their communications to be intercepted, disclosed, accessed, viewed and captured by third parties in real time.

12. Plaintiffs and Class Members used Defendant's Website to submit information related to their past, present, or future health conditions, including, for example, searches for personal medical conditions, treatments and diagnosis, and the booking of medical appointments. Such Private Information would allow a third party, such as Facebook or Google, to know that a specific patient was seeking confidential medical care from Defendant as well as the type of medical care patients are seeking for their past, present, and future physical health.

13. Defendant is a healthcare entity and thus its disclosure of health and medical communications is tightly regulated. HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider may disclose a person's personally identifiable protected health information to a third party without express written authorization.

14. Healthcare patients simply do not anticipate or expect that their trusted

healthcare provider will send personal health information or confidential medical information collected via its webpages to a hidden third party—let alone Facebook and Google, which both have a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without the patients' consent. Neither Plaintiffs nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook or Google.

15. And as noted by the Honorable William J. Orrick in a decision concerning the use of the Facebook Pixel by healthcare organizations,

> Our nation recognizes the importance of privacy in general and health information in particular: the safekeeping of this sensitive information is enshrined under state and federal law. The allegations against Meta are troubling: Plaintiffs raise potentially strong claims on the merits and their alleged injury would be irreparable if proven.[6]

16. Consequently, Plaintiffs bring this action for legal and equitable remedies to address and rectify the illegal conduct and actions described herein, to enjoin Defendant from making similar disclosure of its patients' Private Information in the future, and to fully articulate, *inter alia*, the specific Private Information it disclosed to third parties and to identify the recipients of that information.

17. Defendant breached its statutory and common law obligations to Plaintiffs and Class Members by, *inter alia*,: (i) failing to remove or disengage technology that was known and designed to share web-users' information; (ii) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Private Information to Facebook or others; (iii) failing to take steps to block the transmission of Plaintiffs' and Class Members' Private Information through Tracking Technologies like the Facebook Pixel or Google Analytics; (iv) failing to warn

[6] *In re Meta Pixel Healthcare Litig*., 647 F. Supp. 3d 778, 783 (N.D. Cal. 2022).

Plaintiffs and Class Members; and (v) otherwise failing to design, and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

18. As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) diminution of value of their Private Information, (iv) statutory damages, and (v) the continued and ongoing risk to their Private Information.

19. Plaintiffs seek to remedy these harms and bring causes of action for (i) violation of the Electronics Communication Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*; (ii) violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq.*; (iii) violation of the California Confidentiality of Medical Information Act, Cal. Civil Code §§ 56, *et seq.*; (iv) violation of California Constitution Article 1 § 1, *et seq.*; (v) invasion of privacy; and (vi) unjust enrichment.

**PARTIES**

20. Plaintiff Nick Gaige is, and at all relevant times was, an individual residing in Los Angeles, California.

21. Plaintiff Nicole Seidlin is, and at all relevant times was, an individual residing in Los Angeles, California.

22. Plaintiff Natalie Gianne is, and at all relevant times was, an individual residing in Los Angeles, California.

23. Plaintiff Casey Kassal is, and at all relevant times was, an individual residing in Los Angeles, California.

24. Defendant Exer Holding Company, LLC is a Delaware limited liability company, with its principal place of business located in El Segundo, California.

25. Defendant operates numerous urgent care centers throughout the Los Angeles, California metro area under its brand name Exer Urgent Care.

26. Defendant is a covered entity under HIPAA.

**JURISDICTION & VENUE**

27. This Court has subject matter jurisdiction over this action under 28 U.S.C.

§ 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, is a citizen of a state different from Defendant. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, *et seq.*).

28. This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in this District and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

29. Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant's principal place of business is located in this District, and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

## COMMON FACTUAL ALLEGATIONS

### A. Background

30. Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[7]

31. In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

32. Facebook's Business Tools, including the Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications and servers, thereby enabling the interception and collection of website visitors' activity.

[7] *Facebook, Meta Reports Fourth Quarter and Full Year 2021 Results*, FACEBOOK, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited May 23, 2024).

33. Specifically, the Pixel "tracks the people and type of actions they take."[8] When a user accesses a webpage hosting the Pixel, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook's servers. Notably, this transmission does not occur unless the webpage contains the Pixel.

34. The Pixel is customizable and programmable, meaning that the website owner controls which of its web pages contain the Pixel and which events are tracked and transmitted to Facebook.

35. The process of adding the Pixel to webpages is a multi-step process that must be undertaken by the website owner.[9]

36. Facebook guides the website owner through setting up the Pixel during the setup process. Specifically, Facebook explains that there are two steps to set up a pixel: (1) Create your pixel and set up the pixel base code on your website. You can use a partner integration if one is available to you or you can manually add code to your website. (2) Set up events on your website to measure the actions you care about, like making a purchase. You can use a partner integration, the point-and-click event setup tool, or you can manually add code to your website.[10]

37. Aside from the various steps to embed and activate the Pixel, website owners, like Defendant, must also agree to Facebook's Business Tools Terms by which Facebook requires website owners using the Pixel to "represent and warrant" that they have adequately and prominently notified users about the collection, sharing, and usage of data through Facebook's Business Tools (including the Pixel) and that websites "will not share Business Tool Data . . . that [websites] know or reasonably

---

[8] RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited Oct. 30, 2025).

[9] Business Help Center: How to set up and install a Meta Pixel, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last accessed Oct. 30, 2025).

[10] *Id*.

should know . . . includes health, financial information or other categories of sensitive information . . . ."[11]

38. Stated differently, Plaintiffs' and Class Members' Private Information would not have been disclosed to Facebook but for the Defendant's decisions to install the Pixel on its Website.

39. As explained in more detail below, this secret transmission to Facebook is initiated by Defendant's source code concurrently with Plaintiffs' and Class Members' communications to their intended recipient, Defendant.

**B. Exer Disclosed Their Private Information to Third Parties and Assisted Third Parties in Intercepting Patients' Communications with its Website.**

40. Defendant's Website is accessible on mobile devices and desktop computers and allows patients to communicate with Defendant regarding their medical care and bills.

41. Defendant encouraged patients to use its Website to communicate their Private Information, schedule appointments, communicate information about their medical conditions and treatments, pay medical bills and more.

42. Despite this, Defendant purposely installed Tracking Technologies on its Website and programmed specific webpage(s) to surreptitiously share its patients' private and protected communications, including Plaintiffs' and Class Members' PHI and/or PII, which was sent to Facebook, Google and other third parties.

43. The Tracking Technologies recorded and disseminated patients' information as they navigated and communicated with Defendant via the Website, simultaneously transmitting the substance of those communications to unintended

[11] *Id.*; *see also* Pratyush Deep Kotoky, Facebook collects personal data on abortion seekers: Report (June 16, 2022) https://www.newsbytesapp.com/news/science/facebook-collects-personal-data-on-abortion-seekers/story (quoting Facebook spokesman Dale Hogan as saying that it is "against [Facebook's] policies for websites and apps to send sensitive health data about people through [its] Business Tools") (last accessed Oct. 30, 2025).

and undisclosed third parties.

44. The information disseminated by the Tracking Technologies to third parties constitutes Private Information including medical information patients communicated, requested or viewed, the title of any buttons clicked (such as on the "Services" page, which communicates the particular medical service a patient is seeking for their specific medical condition), the exact phrases typed into the Website's search bar, selections made from drop-down menus or while using filtering tools and other sensitive and confidential information, the divulgence of which is and was highly offensive to Plaintiffs.

45. This is PHI because the webpages have access to "information that relates to any individual's past, present, or future health, health care, or payment for health care."[12]

---

[12] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Oct. 30, 2025) (noting that "IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services."). This guidance was recently vacated *in part* by the Federal District Court for the Northern District of Texas due to the court finding it in part to be the product of improper rulemaking, and it is cited for reference only until the OCR updates its guidance, should it do so in the future. *See American Hosp. Ass'n. v. Becerra*, 2024 WL 3075865 (S.D. Tex., Jun. 20, 2024). Notably, the Court's Order found only that the OCR's guidance regarding covered entities disclosing to third parties users' IP addresses while users navigated *unauthenticated public webpages* ("UPWs") was improper rulemaking. The Order in no way affects or undermines the OCR's guidance regarding covered entities disclosing unique personal identifiers, such as Google or Facebook identifiers, to third parties while patients were making appointments for particular conditions, paying medical bills or logging into (or using) a patient portal. *See id*. at 3-4, 31, n. 8 (vacating the OCR guidance with respect to the "Proscribed Combination" defined as "circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers" but stating that "[s]uch vacatur is not intended to, and should

46. The information collected and disclosed by Defendant's Tracking Technologies is not anonymous and is viewed and categorized by the intercepting party on receipt.

47. The information Facebook received via the Tracking Technologies was linked and connected to patients' Facebook profiles (via their Facebook ID or "c_user id"), which includes other PII.

48. Similarly, Google stores users' logged-in identifier on non-Google websites in its logs. Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads.

49. Simply put, the health information that was disclosed via the Tracking Technologies is personally identifiable and was sent alongside other persistent unique identifiers such as the patients' IP address, Facebook ID and device identifiers.[13]

**C. Exer's Tracking Technologies, Source Code, and Interception of HTTP Requests and Transmission of HTTP Requests.**

50. Web browsers are software applications that allow consumers to navigate the internet and exchange electronic communications, and every "client device" (computer, tablet or smart phone) has a web browser (e.g., Microsoft Edge, Google Chrome, Mozilla's Firefox, etc.).

51. Every website is hosted by a computer "server" which allows the website's owner (Defendant) to display the Website and exchange communications

not be construed as, limiting the legal operability of other guidance in the germane HHS document."). Furthermore, the FTC bulletin on the same topics remains untouched, as do the FTC's enforcement actions against healthcare providers for committing the same or similar actions alleged herein.

[13] *See Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1056 (N.D. Cal. 2021) (discussing how Google collects personal information and IP addresses); *see also* https://developers.facebook.com/docs/meta-pixel/ (last accessed Oct. 30, 2025).

with the website's visitors (Plaintiffs and Class Members) via the visitors' web browser.

52. When patients used Defendant's Website, they engaged in an ongoing back-and-forth exchange of electronic communications with Defendant wherein their web browser communicated with Defendant's computer server—like how two telephones communicate.

53. These communications are invisible to ordinary consumers, but one browsing session may consist of thousands of individual HTTP Requests and HTTP Responses.

54. A patient's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as a "Find Your Location" page), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons and other features that appear on the patient's screen as they navigate Defendant's Website).

55. Every webpage is comprised of both Markup and "source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

56. Defendant's Tracking Technologies were embedded in its Website' source code, which is contained in its HTTP Response. The Tracking Technologies, which were programmed to automatically track patients' communications and transmit them to third parties, executed instructions that effectively opened a hidden spying window into each patients' web browser, through which third parties intercepted patients' communications and activity.

57. For example, when a patient visits www.exerurgentcare.com and selects the link to the "Services" webpage, the patient's browser automatically sends an HTTP Request to Defendant's web server. Defendant's web server automatically returns an HTTP Response, which loads the Markup for that particular webpage. As

depicted below, the user only sees the Markup, not Defendant's source code or underlying HTTP Requests and Responses.




***Figure 1. The image above is a screenshot taken from the user's web browser upon visiting [https://www.exerurgentcare.com/medical-services/](https://www.exerurgentcare.com/medical-services/).***

58. The image above displays the Markup of Defendant's webpage. Behind the scenes, however, Tracking Technologies like the Meta Pixel are embedded in the source code, automatically transmitting everything the patient does on the webpage and effectively opening a hidden spy window into the patients' browser.

**D. Defendant Disclosed Plaintiffs' and Class Members' Private Information to Facebook and other Third Parties Using Tracking Technologies.**

59. In this case, Defendant employed Tracking Technologies to intercept, duplicate and re-direct Plaintiffs' and Class Members' Private Information to Facebook and other third parties.

60. Defendant's source code manipulates the patient's browser by secretly instructing it to disclose the patient's communications (HTTP Requests) with Defendant and to send those communications to Facebook. These transmissions occur

contemporaneously, invisibly and without the patient's knowledge.

61. Thus, without its patients' consent, Defendant used its source code to commandeer and "bug" or "tap" its patients' computing devices, allowing Facebook and other third parties to listen in on all of their communications with Defendant and thereby intercept those communications, including their Private Information.

62. The Tracking Technologies allow Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences and decrease advertising and marketing costs. However, Defendant's Website does not rely on the Tracking Technologies to function.

63. While seeking and using Defendant's services as a medical provider, Plaintiffs and Class Members communicated their Private Information to Defendant via its Website.

64. Plaintiffs and Class Members were not aware that their Private Information would be shared with third parties as it was communicated to Defendant because, amongst other reasons, Defendant did not disclose this fact.

65. Plaintiffs and Class Members never consented, agreed, authorized or otherwise permitted Defendant to disclose their Private Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

66. Defendant's Tracking Technologies sent non-public Private Information to third parties like Facebook and Google, including but not limited to Plaintiffs' and Class Members': (i) status as medical patients; (ii) protected health conditions; (iii) medical treatments; (iv) locations where they sought medical care and (v) specific search queries, such as searches for medical treatment, information, and diagnosis.

67. Importantly, the Private Information Defendant's Tracking Technologies sent to third parties included PII that allowed those third parties to connect the Private Information to a specific patient. Information sent to Facebook was sent alongside the Plaintiffs' and Class Members' Facebook ID ("FID"), thereby allowing individual

patients' communications with Defendant and the Private Information contained in those communications to be linked to their unique Facebook accounts and therefore their identity.[14]

68. A user's FID is linked to their Facebook profile, which contains a wide range of demographic and other information about the user including, but not limited to, location, pictures, personal interests, work history and relationship status. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook ID to locate, access and view the user's corresponding Facebook profile.

69. Defendant deprived Plaintiffs and Class Members of their privacy rights when it: (i) implemented Tracking Technologies that surreptitiously tracked, recorded and disclosed Plaintiffs' and other patients' confidential communications and Private Information; (ii) disclosed patients' protected information to unauthorized third parties and (iii) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

70. By installing and implementing the Meta Pixel, Google Analytics, and other Tracking Technologies, Defendant caused Plaintiffs' and Class Member's communications to be intercepted by and/or disclosed to Facebook, Google, and other third parties, and for those communications to be personally identifiable.

71. As explained below, these unlawful transmissions are initiated by Defendant's source code concurrent with communications made via the Website.

**E. Defendant's Tracking Technologies Disseminate Patient Information Via Its Website.**

72. If a patient uses Defendant's Website to find care, its Website directs them to communicate Private Information, including zip code, city and state or

---

[14] Defendant's Website tracks and transmits data via first-party and third-party cookies. The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers.

address, type of visit (office or virtual), reason for seeking care and phone number.

73. Unbeknownst to the patient, this communication is sent to Facebook and other third-party entities via Defendant's Pixel and other Tracking Technologies, including the location a patient has selected.

74. In the example below, the user navigated to the "Locations" page on Defendant's Website where the user is prompted by Defendant's Website to find a




location by inputting personal information regarding their location and medical condition:

***Figure 2. Screenshot taken from exerurgentcare.com as the user searches for a location communicates information via the search bar.***

75. Unbeknownst to ordinary patients, this webpage—which is undoubtedly used to communicate Private Information for the purpose of seeking medical treatment—contains Defendant's Tracking Technologies. The image below shows the "behind the scenes" portion of the website that is invisible to ordinary users:




***Figure 3. Screenshot from Defendant's Website depicting back-end network traffic after the user chooses a location.***

76. Thus, without alerting the user, Defendant's Pixel sends the communications the user made via the webpage to Facebook, and the images below confirm that the communications Defendant sends to Facebook contain the user's Private Information.


▾ Request Headers

| | |
|---|---|
| :authority: | www.facebook.com |
| :method: | GET |
| :path: | /tr/?id=412111446762705&ev=PageView&dl=https%3A%2F%2Fexerurgentcare.com&rl=https%3A%2F%2Fexerurgentcare.com&if=false&ts=1720805019033&sw=1600&sh=1067&v=2.9.161&r=stable&ec=0&o=4124&fbp=fb.1.1719978326740.870398675823090046&pm=1&hrl=3f532e&ler=other&it=1720805018940&coo=false&cs_cc=1&cas=25222053814076607%2C5996948347012899&cdl=&rqm=GET |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br, zstd |
| Accept-Language: | en-US,en;q=0.9 |
| Cookie: | sb=h9WCZqatviXVCm_wXMDL42Jl; datr=h9WCZnuMq3rUaBLLpzpNnivS; ps_n=1; dpr=1.5; c_user=61560564045991; xs=37%3APDHxTl5Wsp3gYg%3A2%3A1719888771%3A-1%3A-1%3A%3AAcXSibLC8bVFOWVs38Le1mniSjUP7X7CnFluBhF6Ndk; |

***Figure 4: Screenshot from the Network traffic report depicting the header that Facebook is sent including specific user identifiers.***

77. The first line of highlighted text, "id=412111446762705" refers to Defendant's Pixel ID and confirms that it implemented the Pixel into its source code for this webpage and transmitted info to Facebook from this webpage.

78. The text ("GET"), at the top of the image, demonstrates that Defendant's Pixel sent the user's communications, and the Private Information contained therein, alongside the user's Facebook ID (c_user ID) thereby allowing the user's communications and actions on the website to be linked to their specific Facebook profile.

79. The image demonstrates that the user's Facebook ID (highlighted as "c_user=" in the image above) was sent alongside the other data.

80. Together with the identifying information, Defendant discloses to Facebook the exact location that the user is searching for.




***Figure 5: Screenshot of the payload that Facebook is sent from the user's search for a specific location.***

81. The screenshot above displays the Pixel id number of the tracker installed on Defendant's website. On the line below, "ev: PageView," identifies and categorizes which actions the user took on the webpage ("ev" is an abbreviation for event, and "PageView" is the type of event). Thus, this identifies the user as having searched for and navigated to the webpage with Exer's Anaheim-South location.

82. Exer also discloses that the webpage the user navigated to prior to this was the general "locations" page.

83. Defendant also discloses the specific and personal medical conditions, tests and treatments that users search for on its Website. In the images below we see that when a user communicates their PHI to Exer by searching for information on their medical conditions on the "patient services" webpage, Exer discloses to Facebook the specific conditions and services that the user searches for.




***Figure 6: Screenshot of the payload that Facebook is sent from the user's search for "std testing" in "patient services."***

84. In Figure 6, above, we can see that Exer discloses when a user searches for "patient services" and specifically communicates that they are asking for information concerning "std testing."

85. In Figure 7, below, Exer is disclosing to Facebook that a user has is communicating and searching for information concerning the medical need for "abscess cyst drainage."




***Figure 7: Screenshot of the payload that Facebook is sent from the user's search for "abscess-cyst-drainage" in "patient services."***

86. To make matters worse, Defendant's Pixel even tracks and records the exact text and phrases that a user types into the general search bar located on Defendant's homepage.

87. That exact phrase is sent to Facebook, thereby allowing the user's medical condition to be linked to their individual Facebook account for future retargeting and exploitation. There is no legitimate reason for sending this information to Facebook.

88. Defendant discloses the user's website activity and the contents of their communications to Facebook alongside their PII. Several different methods allow marketers and third parties to identify individual website users, but the examples above demonstrate what happens when the website user is logged into Facebook on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Pixels.

89. For example, the Pixel transmits the user's c_user cookie, which contains that user's unencrypted Facebook ID, and allows Facebook to link the user's online communications and interactions to their individual Facebook profile.

90. Facebook receives at least five cookies when Defendant's website

transmits information via the Pixels:



✕ Headers Payload Preview Response Initiator Timing Cookies

**Request Cookies** ☐ show filtered out request cookies

| Name | Value | Domain | Path | Exp... | Size | Htt... | Sec... | Sa... | Par... | Prio... |
|---|---|---|---|---|---|---|---|---|---|---|
| c_user | 615605... | .facebook.com | / | 202... | 20 | | ✓ | None | | Me... |
| datr | mGuD... | .facebook.com | / | 202... | 28 | ✓ | ✓ | None | | Me... |
| fr | 1BSDA... | .facebook.com | / | 202... | 82 | ✓ | ✓ | None | | Me... |
| sb | mGuD... | .facebook.com | / | 202... | 26 | ✓ | ✓ | None | | Me... |
| xs | 13%3A... | .facebook.com | / | 202... | 96 | ✓ | ✓ | None | | Me... |

***Figure 8. Screenshot of network analysis showing cookies sent to Facebook when a user visits exerurgentcare.com.***

91. The fr cookie contains an encrypted Facebook ID and browser identifier.[15] Facebook, at a minimum, uses the fr cookie to identify users, and this cookie can stay on a user's website browser for up to 90 days after the user has logged out of Facebook.[16]



Sources Network Performance Memory Application Security » ⊗ 1 ⚠ 274 ⚑ 1

Filter ☐ Only show cookies with an issue

| Name | Value | Domain | Path | Exp... | Size | Htt... | Sec... | Sa... |
|---|---|---|---|---|---|---|---|---|
| _fbp | fb.1.17... | .exerurgentcare.com | / | 202... | 41 | | | Lax |

***Figure 9. Screenshot showing Defendant's use of the _fbp cookie.***

92. At each stage, Defendant also utilizes the _fbp cookie, which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user.[17]

93. The Pixel uses both first- and third-party cookies, and both were used on

---

[15] Data Protection Commissioner, *Facebook Ireland Ltd: Report of Re-Audit* (Sept. 21, 2012), p. 33, http://www.europe-v-facebook.org/ODPC_Review.pdf (last visited Oct. 30, 2025).

[16] *Cookies & other storage technologies*, https://www.facebook.com/policy/cookies/ (last visited Oct. 30, 2025).

[17] Defendant's Website tracks and transmits data via first-party and third-party cookies. The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers.

the Website.[18]

94. At present, the full breadth of Defendant's tracking and data sharing practices is unclear, but evidence suggests Defendant is using additional tracking pixels and tools to transmit its patients' Private Information to additional third parties.

95. Defendant does not disclose that the Pixels, Google Analytics, or any other Tracking Technologies embedded in the Website's source code track, record, and transmit Plaintiffs' and Class Members' Private Information to Facebook and Google. Moreover, Defendant never received consent or written authorization to disclose Plaintiffs' and Class Members' private communications to Facebook or Google.

**G. Defendant's Conduct Is Unlawful and Violated Industry Norms.**

***i. Defendant Violated its own Privacy Policies.***

96. Defendant's Website Privacy Policy states that "[w]e may disclose aggregated information about our users, and information that does not identify any individual, without restriction. However, except as otherwise described in this Privacy Policy, or if we inform you otherwise at the time of data collection and receive your consent where required, we will not sell, trade, or share your Personal Information with third parties."[19]

97. Defendant's Website Privacy Policy further states that "to the extent we collect health information from you that is subject to the Health Information Portability and Accountability Act ("HIPAA") or state privacy laws, different standards apply. For more information about how we use and disclose such health

---

[18] A first-party cookie is "created by the website the user is visiting"—in this case, Defendant's Website. A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. The _fbp cookie is always transmitted as a first-party cookie. At a minimum, Facebook uses the fr, _fbp, and c_user cookies to link website visitors' data to their Facebook IDs and corresponding accounts.

[19] *See* https://exerurgentcare.com/privacy-policy/ (last updated January 28, 2025).

information, please see our Notice of Privacy Policies."[20]

98. Defendant's Notice of Privacy Practices is also referred to on its Website as its' Notice of HIPAA Privacy Practices.

99. Defendant's Notice of HIPAA Privacy Practice is clear that patients have certain rights when it comes to their personal health information."[21]

100. Defendant's Notice of HIPAA Privacy Practice further outlines how Defendant may use and disclose medical information for: treat you, run our organization, bill for your services, help with public health and safety issues, do research, comply with law, respond to organ and tissue donation requests, work with medical examiner or funeral director, address workers' compensation, law enforcement, and other government requests, respond to lawsuits and legal action.[22]

---

[20] *Id.*
[21] *See* https://exerurgentcare.com/wp-content/uploads/2023/07/HIPAA-NPP-7-17-23.pdf.
[22] *Id*.

**We typically use or share your health information in the following ways:**

Treat you: We can use your health information and share it with other professionals who are treating you. For example, a doctor treating you for an injury asks another doctor about your overall condition.

Run our organization: We can use and share your health information to run our practice, improve your care, and contact you when necessary. For example, we use health information about you to manage your treatment and services.

Bill for your services: We can use and share your health information to bill and get payment. For example, we give information about you to your health insurance plan so it will pay for your services.

**How else can we use or share your health information?**

We are allowed or required to share your information in other ways – usually in ways that contribute to the public good, such as public health and research. We have to meet many conditions in the law before we can share your information for these purposes. For more information see www.hhs.gov/ocr/privacy/hipaa/understanding/consumers/index.html.

Help with public health and safety issues: We can share health information about you for certain situations such as (1) preventing disease; (2) helping with product recalls; (3) reporting adverse reactions to medications; (4) reporting suspected abuse, neglect or domestic violence; (5) preventing or reducing a serious threat to anyone's health or safety.

Do research: We can use or share your information for health research.

Comply with the law: We will share information about you if state or federal laws required it, including with the Department of Health and Human Services if it wants to see that we're complying with federal privacy law.

Respond to organ and tissue donation requests: We can share health information about you with organ procurement organizations.

Work with a medical examiner or funeral director: We can share health information with a coroner, medical examiner, or funeral director when an individual dies.

Address workers' compensation, law enforcement, and other government requests: We can use or share health information about you: (1) for workers' compensation claims; (2) for law enforcement purposes or with a law enforcement official; (3) with health oversight agencies for activities authorized by law; (4) for special government functions such as military, national security, and presidential protective services.

Respond to lawsuits and legal actions: We can share health information about you in response to a court or administrative order, or in response to a subpoena.

101. However, other uses of medical information not covered by the Notice of HIPAA Privacy Practice, such as marketing and retargeting require written authorization.[23]

102. As a result, Defendant violated its own Notice of HIPAA Privacy Practice by unlawfully disclosing Plaintiffs' and Class Members' Private Information to Meta (Facebook), Google, and likely other third parties without written authorization.

***ii. Defendant Violated HIPAA Standards.***

103. Under HIPAA, a healthcare provider may not disclose personally

[23] *Id*.

identifiable, non-public medical information about a patient, a potential patient or household member of a patient for marketing purposes without the patients' express written authorization.[24]

104. The HIPAA Privacy Rule "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[25]

105. The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

106. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

107. Under the HIPPA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis

[24] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).
[25] HHS.gov, HIPAA For Professionals (last visited Oct. 30, 2025), https://www.hhs.gov/hipaa/for-professionals/index.html.

that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

A. Names;

***

H. Medical record numbers;

***

J. Account numbers;

***

M. Device identifiers and serial numbers;

N. Web Universal Resource Locators (URLs);

O. Internet Protocol (IP) address numbers; … and

R. Any other unique identifying number, characteristic, or code…; and"

The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514.

108. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

109. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered

entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

110. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

111. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

112. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[26]

113. In its guidance for marketing, HHS further instructs:

---

[26]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Oct. 30, 2025).

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (emphasis added).[27]

114. As alleged above, the OCR addresses the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using tracking technologies.[28]

115. The Bulletin expressly provides that **"[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**." (emphasis in original).

116. As such, Defendant's actions violated HIPAA.

***ii. Defendant Violated Industry Standards.***

117. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

118. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

---

[27] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited Oct. 30, 2025).

[28] *See* OCR Bulletin *supra*, note 12.

119. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)

120. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

121. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…:(c ) release patient information only in keeping ethics guidelines for confidentiality.

**H. Plaintiffs' and Class Members' Reasonable Expectation of Privacy.**

122. Plaintiffs and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

123. Indeed, at all times when Plaintiffs and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

124. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

125. For example, a Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[29]

126. Personal data privacy and obtaining consent to share Private Information are material to Plaintiffs and Class Members.

127. Plaintiffs and Class Members would not have used Defendant's Website, would not have provided their Private Information to Defendant and would not have paid for Defendant's healthcare services or would have paid less for them, had they known that Defendant would disclose their Private Information to third parties.

128. Plaintiffs' and Class Members' reasonable expectations of privacy in their PII/PHI are grounded in, among other things, Defendant's status as a healthcare provider, Defendant's common law obligation to maintain the confidentiality of

---

[29] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-lessconfident-about-healthcare-data-privacy-and-car-safety-a3980496907/ (last visited Oct. 30, 2025).

patients' PII/PHI, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification and Defendant's express and implied promises of confidentiality.

**I. IP Addresses Are PII.**

129. In addition to patient status, medical treatment and patients' unique Facebook ID, Defendant improperly disclosed and otherwise assisted Facebook, Google and/or other third parties with intercepting Plaintiffs' and Class Members' Computer IP addresses.

130. An IP address is a number that identifies the address of a device connected to the Internet.

131. IP addresses are used to identify and route communications on the Internet.

132. IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

133. Facebook tracks every IP address ever associated with a Facebook user, and uses that information for targeting individual homes and their occupants with advertising.

134. As to Google, over 70% of online websites use Google's visitor-tracking products, Google Analytics and Google Ad Manager.

135. Whenever a user visits a website that is running Google Analytics and Google Ad Manager, Google's software scripts on the website surreptitiously direct the user's browser to send a secret, separate message to Google's servers in California, which includes the user's IP address, the user's geolocation, information contained in Google cookies, any user-ID issued by the website to the user, and information about the browser the user is using.

136. Under HIPAA, an IP address is considered PII.[30]

137. HIPAA defines PII to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses.[31]

138. HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information."[32]

139. Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

**J. Defendant Was Enriched and Benefitted from the Use of The Tracking Technologies and Unauthorized Disclosures.**

140. One of the primary reasons that Defendant decided to embed the Pixel and other tracking technologies on its Website was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data in the absence of express written consent.

141. Defendant's use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy.

142. In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook and Google in the form of enhanced advertising services and more cost-efficient marketing.

143. Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions.

144. The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a health care website back to Facebook via the Tracking Technologies and the Pixel embedded on, in this case,

[30] HIPAA defines PII to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).
[31] *See* 45 C.F.R. § 164.514(2).
[32] 45 C.F.R. § 164.514(2)(ii); *see also* 45 C.F.R. § 164.514(b)(2)(i)(O).

Defendant's Website.

145. For example, when a user searches for an urgent care location on the Website, that information is sent to Facebook. Facebook can then use its data on the user to find more users to click on an Exer ad and ensure that those users targeted are more likely to convert.[33]

146. Through this process, the Pixel loads and captures as much data as possible when a user loads a telehealth website that has installed the Pixel. The information the Pixel captures, "includes URL names of pages visited, and actions taken—all of which could be potential examples of health information."

147. As part of its marketing campaign, Defendant re-targeted patients and potential patients to get more visitors to its Website to use its services. Defendant did so through use of the intercepted patient data it obtained, procured and/or disclosed in the absence of express written consent.

148. But companies have started to warn about the potential HIPAA violations associated with using pixels and tracking technologies because many such trackers are not HIPAA-compliant or are only HIPAA-compliant if certain steps are taken.[34]

149. For example, Freshpaint, a healthcare marketing vendor, cautioned that "Meta isn't HIPAA-compliant. They don't sign BAAs, and the Meta Pixel acts like a giant personal user data vacuum sending PHI to Meta servers," and "[i]f you followed the Facebook (or other general) documentation to set up your ads and conversion tracking using the Meta Pixel, remove the Pixel now.[35]

---

[33] *See How to Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking* (Mar. 14, 2023), https://www.freshpaint.io/blog/how-to-make-facebook-ads-hipaa-compliant-and-still-get-conversion-tracking (last accessed Oct. 30, 2025).

[34] *See The guide to HIPAA compliance in analytics*, https://campaign.piwik.pro/wpcontent/uploads/2023/10/The-guide-to-HIPAA-compliance-in-analytics.pdf (explaining that Google Analytics 4 is not HIPAA-compliant) (last accessed Oct. 30, 2025).

[35] How To Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking, supra note 33.

150. Medico Digital also warns that "retargeting requires sensitivity, logic and intricate handling. When done well, it can be a highly effective digital marketing tool. But when done badly, it could have serious consequences."[36]

151. By utilizing the Tracking Technologies, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiffs and Class Members and violating their rights under federal and Arizona law.

**K. Plaintiffs' and Class Members' Private Information Had Financial Value.**

152. Plaintiffs' Private Information has economic value and Defendant's disclosures harmed Plaintiffs and Class Members.

153. Facebook regularly uses the data that it acquires to create Core and Custom Audiences as well as Lookalike Audiences and then sells that information to advertising clients.

154. Plaintiffs' and Class Members' Private Information has considerable value as highly monetizable data especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

155. Professor Paul M. Schwartz, writing in the Harvard Law Review, notes: "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer

[36] The complex world of healthcare retargeting (July 10, 2023), https://www.medicodigital.com/the-complicated-world-of-healthcare-retargeting/ (last accessed Oct. 30, 2025).

information."[37]

156. Various reports have been conducted to identify the value of health data. For example, in 2023, the Value Examiner published a report entitled Valuing Healthcare Data. The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[38]

157. Trustwave Global Security also published a report entitled The Value of Data. With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[39]

158. The value of health data has also been reported extensively in the media. For example, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[40]

159. Similarly, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the

---

[37] Paul M. Schwartz, Property, Privacy, and Personal Data, 117 Harv. L. Rev. 2055, 2056-57 (2004).

[38] *See* https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf (last accessed Oct. 30, 2025).

[39] *See* https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (citing https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf) (last accessed Oct. 30, 2025).

[40] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited Oct. 30, 2025).

extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[41]

160. Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[42]

161. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See, e.g.*, *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

162. This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiffs herein can sell or monetize their own data.

163. Several companies, such as Google, Nielsen, UpVoice, HoneyGain and SavvyConnect, have products through which they pay consumers for a license to track their data.[43]

---

[41] *See* https://time.com/4588104/medical-data-industry/ (last visited Oct. 30, 2025).

[42] VERO, HOW TO COLLECT EMAILS ADDRESSES ON TWITTER https://www.getvero.com/resources/twitter-lead-generation-cards/ (last visited Oct. 30, 2025).

[43] *See* 10 Apps for Selling Your Data for Cash, https://wallethacks.com/apps-for-sellingyour-data/ (last accessed June 1, 2024).

164. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

165. Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[44]

166. These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

167. Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, it can take years to undo the damage caused.

168. In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

169. Defendant gave away Plaintiffs' and Class Members' communications and transactions on its Website without permission.

170. The unauthorized access to Plaintiffs' and Class Members' personal and Private Information has diminished the value of that information, resulting in harm to Website users, including Plaintiffs and Class Members.

## PLAINTIFFS' EXPERIENCES WITH EXER

***Plaintiff Nick Gaige***

171. As a condition of receiving Defendant's services, Plaintiff Gaige disclosed his Private Information to Defendant on numerous occasions, and most recently in February and March 2024.

172. Plaintiff Gaige has been a patient of Defendant since approximately 2016.

---

[44] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (Last accessed Oct. 30, 2025).

173. Plaintiff Gaige accessed Defendant's Website on his phone and computer to receive healthcare services from Defendant and at Defendant's direction.

174. During the relevant time period, Plaintiff Gaige used Defendant's Website to research symptoms, testing, and diagnosis [redacted] His searches for information related to his medical conditions included him visiting specific webpages that revealed his PHI through the URLs as well as searches he performed through the Website's search bar that disclosed the specific phrases used to search for information related to his medical conditions.

175. Plaintiff Gaige also used Defendant's [redacted]

176. Plaintiff Gaige used the Website's search bar and communicated information about his specific medical conditions resulting from an injury, including but not limited to the terms [redacted]

177. The full scope of Defendant's interceptions and disclosures of Plaintiff Gaige's communications to Facebook and other third parties can only be determined through formal discovery. However, in addition to disclosing the specific searches Plaintiff Gaige entered into the Website's search bar, Defendant intercepted at least the following communications about Plaintiff Gaige's patient status, medical conditions, treatments sought, and the receipt of healthcare, via the following long-URLs or substantially similar URLs that were sent to Meta via the Pixel and which contain information concerning Plaintiff Gaige's specific medical conditions, queries, and treatments sought:

- [redacted]
- [redacted]
- [redacted]

[redacted]

178. Plaintiff Gaige has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

179. Plaintiff Gaige reasonably expected that his communications with Defendant via the Website were confidential, solely between himself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

180. However, as a result of the Meta Pixel Defendant chose to install on its Website, Plaintiff Gaige's Private Information was intercepted, disclosed, viewed, analyzed and used by unauthorized third parties.

181. Defendant transmitted Plaintiff Gaige's Facebook ID, computer IP address and other device and unique online identifiers to Facebook. Defendant also transmitted information such as health and medical information including Plaintiff Gaige's particular health condition, the type of medical treatment sought, patient status and the fact that Plaintiff Gaige attempted to or did book a medical appointment.

182. Gaige never consented to the disclosure of or use of his Private Information by third parties or to Defendant enabling third parties, including Facebook, to access or interpret such information. Plaintiff Gaige never consented to any third parties' receipt or use of him Private Information.

183. Notwithstanding, through the Tracking Technologies embedded on Defendant's Website, Defendant transmitted Plaintiff Gaige's Private Information to,

at a minimum, Facebook and likely many other third parties like Google, Bing and others.

184. As a result, Plaintiff Gaige received targeted ads on Facebook or Instagram related to his specific medical conditions and/or treatments, including but not limited to medications, treatments, and other specialized medical care for [redacted]

185. By making these disclosures without his consent, Defendant breached Plaintiff Gaige's privacy and unlawfully disclosed his Private Information.

186. Defendant did not inform Plaintiff Gaige that it had shared his Private Information with Facebook.

187. Plaintiff Gaige used and continues to use the same devices to maintain and to access an active Facebook account throughout the relevant period for this case.

188. Plaintiff Gaige has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future unauthorized disclosure(s).

***Plaintiff Nicole Seidlin***

189. Plaintiff Seidlin was a patient of Defendant's between 2021 and 2025, during which time she used the Website to [redacted]

190. As a condition of receiving Defendant's services, Plaintiff Seidlin disclosed her Private Information to Defendant on numerous occasions, beginning in 2021, including for example in April 2024, and continuing through the present.

191. Plaintiff Seidlin has been a patient of Defendant since approximately 2021.

192. Plaintiff Seidlin accessed Defendant's Website and patient portal on her phone and computer to receive healthcare services from Defendant and at Defendant's direction.

193. During the relevant time period, Plaintiff Seidlin used Defendant's Website to [redacted] Her searches for information related to her medical conditions included her visiting specific webpages that revealed her PHI through the URLs as well as searches she performed through the Website's search bar disclosed the specific phrases used to search for information related to her medical conditions.

194. Plaintiff Seidlin also used Defendant's Website and patient portal to [redacted]

195. Plaintiff Seidlin used the Website's search bar and communicated information about her specific medical needs, including but not limited to [redacted]

196. The full scope of Defendant's interceptions and disclosures of Plaintiff Seidlin's communications to Facebook and other third parties can only be determined through formal discovery. However, in addition to disclosing the specific searches Plaintiffs entered into the Website's search bar, Defendant intercepted at least the following communications about Plaintiff Seidlin's patient status, medical conditions, treatments sought, and the receipt of healthcare, via long-URLs or substantially similar URLs that were sent to Meta via the Pixel and which contain information concerning Plaintiff Seidlin's specific medical conditions, queries, and treatments sought:

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

[redacted]

197. Plaintiff Seidlin has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

198. Plaintiff Seidlin reasonably expected that her communications with Defendant via the Website and patient portal were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

199. However, as a result of the Meta Pixel Defendant chose to install on its Website, Plaintiff Seidlin's Private Information was intercepted, disclosed, viewed, analyzed and used by unauthorized third parties.

200. Defendant transmitted Plaintiff Seidlin's Facebook ID, computer IP address and other device and unique online identifiers to Facebook. Defendant also transmitted information such as health and medical information including Plaintiff Seidlin's [redacted]

201. Plaintiff Seidlin never consented to the disclosure of or use of her Private Information by third parties or to Defendant enabling third parties, including Facebook, to access or interpret such information. Plaintiff Seidlin never consented to any third parties' receipt or use of her Private Information.

202. Notwithstanding, through the Tracking Technologies embedded on Defendant's Website, Defendant transmitted Plaintiff Seidlin's Private Information to, at a minimum, Facebook and likely many other third parties like Google, Bing and others.

203. As a result, Plaintiff Seidlin received targeted ads on Facebook or Instagram related to [redacted]

204. By making these disclosures without her consent, Defendant breached Plaintiff Seidlin's privacy and unlawfully disclosed her Private Information.

205. Defendant did not inform Plaintiff Seidlin that it had shared her Private Information with Facebook.

206. Plaintiff Seidlin used and continues to use the same devices to maintain and to access an active Facebook account throughout the relevant period for this case.

207. Plaintiff Seidlin has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future unauthorized disclosure(s).

***Plaintiff Natalie Gianne***

208. Plaintiff Gianne was a patient of Defendant's between 2019 and 2025, during which time [redacted]

209. As a condition of receiving Defendant's services, Plaintiff Gianne disclosed her Private Information to Defendant on numerous occasions, including April 2022, and most recently in April 2024.

210. Plaintiff Gianne accessed Defendant's Website and patient portal on her phone and computer to receive healthcare services from Defendant and at Defendant's direction.

211. During the relevant time period, Plaintiff Gianne used Defendant's Website [redacted]

[redacted]

212. Plaintiff Gianne also used Defendant's Website to [redacted]

213. Plaintiff Gianne used the Website's search bar and communicated information about her specific medical needs, including but not limited to the terms [redacted]

214. The full scope of Defendant's interceptions and disclosures of Plaintiff Gianne's communications to Facebook and other third parties can only be determined through formal discovery. However, in addition to disclosing the specific searches Plaintiff Gianne entered into the Website's search bar, Defendant intercepted at least the following communications about Plaintiff Gianne's patient status, medical conditions, treatments sought, and the receipt of healthcare, via long-URLs or substantially similar URLs that were sent to Meta via the Pixel and which contain information concerning Plaintiff Gianne's specific medical conditions, queries, and treatments sought:

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

215. Plaintiff Gianne has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

216. Plaintiff Gianne reasonably expected that her communications with Defendant via the Website and patient portal were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

217. However, as a result of the Meta Pixel Defendant chose to install on its Website, Plaintiff Gianne's Private Information was intercepted, disclosed, viewed, analyzed and used by unauthorized third parties.

218. Defendant transmitted Plaintiff Gianne's Facebook ID, computer IP address and other device and unique online identifiers to Facebook. Defendant also transmitted information such [redacted]

219. Plaintiff Gianne never consented to the disclosure of or use of her Private Information by third parties or to Defendant enabling third parties, including Facebook, to access or interpret such information. Plaintiff Gianne never consented to any third parties' receipt or use of her Private Information.

220. Notwithstanding, through the Tracking Technologies embedded on Defendant's Website, Defendant transmitted Plaintiff Gianne's Private Information to, at a minimum, Facebook and likely many other third parties like Google, Bing and others.

221. As a result, Plaintiff Gianne received targeted ads on Facebook or Instagram related to [redacted]

222. By making these disclosures without her consent, Defendant breached Plaintiff Gianne's privacy and unlawfully disclosed her Private Information.

223. Defendant did not inform Plaintiff Gianne that it had shared her Private Information with Facebook.

224. Plaintiff Gianne used and continues to use the same devices to maintain

and to access an active Facebook account throughout the relevant period for this case.

225. Plaintiff Gianne has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future unauthorized disclosure(s).

***Plaintiff Casey Kassal***

226. Plaintiff Kassal was a patient of Defendant's between April 2023 and August 2024, during which time [redacted]

227. As a condition of receiving Defendant's services, Plaintiff Kassal disclosed his Private Information to Defendant on numerous occasions, including July 2023, and most recently in August 2024.

228. Plaintiff Kassal accessed Defendant's Website and patient portal on his phone and computer to receive healthcare services from Defendant and at Defendant's direction.

229. During the relevant time period, Plaintiff Kassal used Defendant's Website [redacted]

230. Plaintiff Kassal also used Defendant's Website to [redacted]

231. Plaintiff Kassal used the Website's search bar and communicated information about [redacted]

232. The full scope of Defendant's interceptions and disclosures of Plaintiff Kassal's communications to Facebook and other third parties can only be determined through formal discovery. However, in addition to disclosing the specific searches Plaintiff Kassal entered into the Website's search bar, Defendant intercepted at least the following communications about Plaintiff Kassal's patient status, medical conditions, treatments sought, and the receipt of healthcare, via long-URLs or substantially similar URLs that were sent to Meta via the Pixel and which contain information concerning Plaintiff Kassal's specific medical conditions, queries, and treatments sought:

[redacted]

233. Plaintiff Kassal has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

234. Plaintiff Kassal reasonably expected that his communications with Defendant via the Website and patient portal were confidential, solely between himself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

235. However, as a result of the Meta Pixel Defendant chose to install on its Website, Plaintiff Kassal's Private Information was intercepted, disclosed, viewed, analyzed and used by unauthorized third parties.

236. Defendant transmitted Plaintiff Kassal's Facebook ID, computer IP

address and other device and unique online identifiers to Facebook. Defendant also transmitted information such [redacted]

237. Plaintiff Kassal never consented to the disclosure of or use of his Private Information by third parties or to Defendant enabling third parties, including Facebook, to access or interpret such information. Plaintiff Kassal never consented to any third parties' receipt or use of his Private Information.

238. Notwithstanding, through the Tracking Technologies embedded on Defendant's Website, Defendant transmitted Plaintiff Kassal's Private Information to, at a minimum, Facebook and likely many other third parties like Google, Bing and others.

239. As a result, Plaintiff Kassal received targeted ads on Facebook or Instagram related to [redacted]

240. By making these disclosures without his consent, Defendant breached Plaintiff Kassal's privacy and unlawfully disclosed his Private Information.

241. Defendant did not inform Plaintiff Kassal that it had shared his Private Information with Facebook.

242. Plaintiff Kassal used and continues to use the same devices to maintain and to access an active Facebook account throughout the relevant period for this case.

243. Plaintiff Kassal has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future unauthorized disclosure(s).

## TOLLING

244. Any applicable statutes of limitation has been tolled by the "delayed discovery" rule. Plaintiffs did not know (and had no way of knowing) that their PII and/or PHI was intercepted and unlawfully disclosed to Facebook, Google and

potentially other third parties because Defendant kept this information secret. Plaintiffs only became aware of the disclosure of their information in June 2024 and October 2025. Alternatively, applicable statutes of limitation have been tolled by other applicable rules or doctrines.

## CLASS ACTION ALLEGATIONS

245. Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure.

246. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States who are, or were, patients of Defendant or any of its affiliates, used Defendant's Website and had their Private Information disclosed to a third party without authorization.

247. The California Sub-Class Plaintiffs seek to represent is defined as:

> All individuals residing in the State of California who are, or were, patients of Defendant or any of its affiliates, used Defendant's Website and had their Private Information disclosed to a third party without authorization or consent.

248. The Nationwide Class and California Sub-Class are collectively referred to as the "Class" unless otherwise and more specifically identified.

249. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

250. Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

251. Numerosity, Fed R. Civ. P. 23(a)(1). The Class Members are so numerous

that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI may have been improperly disclosed to Facebook, and the Class is identifiable within Defendant's records.

252. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant adequately, promptly and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

d. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

e. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

g. Whether Plaintiffs and Class Members are entitled to actual, consequential and/or nominal damages as a result of Defendant's wrongful conduct; and

h. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

253. Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's incorporation of the Facebook Pixel, due to Defendant's

misfeasance.

254. Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

255. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

256. Policies Generally Applicable to the Class. Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's

conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

257. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

258. The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

259. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

260. Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

261. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

262. Issue Certification, Fed. R. Civ. P. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

a. Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information;

b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## CAUSES OF ACTION

## COUNT I

**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(1) *et seq.***
**UNAUTHORIZED INTERCEPTION, USE AND DISCLOSURE**
**(On Behalf of Plaintiffs & the Nationwide Class)**

263. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

264. The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

265. The ECPA protects both sending and receipt of communications.

266. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

267. The transmissions of Plaintiffs' Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

268. The transmissions of Plaintiffs' Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

269. **Electronic Communications**. The transmission of Private Information between Plaintiffs and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

270. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

271. **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. §

2510(4), (8).

272. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

273. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The cookies Defendant and Meta and Google use to track Plaintiffs' and Class Members' communications;

b. Plaintiffs' and Class Members' browsers;

c. Plaintiffs' and Class Members' computing devices;

d. Defendant's web-servers and

e. The Tracking Technologies deployed by Defendant to effectuate the sending and acquisition of patient communications.

274. Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Technologies embedded and operating on its Website, including the Pixel, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiffs' and Class Members' electronic communications to third parties, including Facebook and Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

275. Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Technologies embedded and operating on its Website, including the Pixel, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiffs' and Class Members' electronic communications, for purposes other than providing health care services to Plaintiffs and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

276. Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Technologies it embedded and operated on its Website, contemporaneously and intentionally redirected and disclosed the contents of Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

277. Defendant's intercepted communications include, but are not limited to, the contents of communications to and/or from Plaintiffs' and Class Members' regarding PII and PHI, treatment, scheduling details and bill payments.

278. Additionally, through the above-described Tracking Technologies and intercepted communications, this information was, in turn, used by third parties, such as Facebook, to 1) place Plaintiffs in specific health-related categories and 2) target Plaintiffs with particular advertising associated with Plaintiffs' specific health conditions.

279. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

280. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

281. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Technologies to track and utilize Plaintiffs' and Class Members' PII and PHI for financial gain.

282. Defendant was not acting under color of law to intercept Plaintiffs' and

Class Members' wire or electronic communication.

283. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' privacy via the Tracking Technologies.

284. Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

285. **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State, such as California—namely, violations of HIPAA and invasion of privacy, among others.

286. **Any party exception in 18 U.S.C. § 2511(2)(d) does not apply.** The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

287. Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding and disclosure of Plaintiffs' and Class Members' Private Information, separate from the interception of that information, does not qualify for the party exemption.

288. Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information (IIHI) to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) ***relates to the past, present,***

> ***or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual***, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[45]

289. Plaintiffs' information that Defendant disclosed to third parties qualifies as IIHI. Defendant also violated Plaintiffs' expectations of privacy and violated 42 U.S.C. § 1320d(6), which constitutes tortious and/or criminal conduct. Defendant disclosed the wire or electronic communications to Facebook and other third parties to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiffs' and Class Members' PII and PHI for financial gain.

290. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

291. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

b. Disclosed IIHI to Facebook and Google without patient authorization.

292. Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Facebook and Google source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

293. Healthcare patients have the right to rely upon the promises that companies make to them. Defendant accomplished its tracking and retargeting through deceit and disregard, such that an actionable claim may be made, in that it

[45] § 1320d-(6) (emphasis added).

was accomplished through source code that cause Facebook pixels and cookies (including but not limited to the fbp, ga and gid cookies) and other tracking technologies to be deposited on Plaintiffs' and Class Members' computing devices as "first-party" cookies that are not blocked.

294. The fbp, ga, and gid cookies, which constitute programs, commanded Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

295. Defendant knew or had reason to know that the fbp, ga, and gid cookies would command Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

296. Defendant's scheme or artifice to defraud in this action consists of: (a) the false and misleading statements and omissions in its privacy policy (HIPAA Notice) set forth above, including the statements and omissions recited in the claims below and (b) the placement of the 'fbp' cookie on patient computing devices disguised as a first-party cookie on Defendant's Website rather than a third-party cookie from Meta.

297. Defendant acted with the intent to defraud in that it willfully invaded and took Plaintiffs' and Class Members' property rights (a) to the confidentiality of Private Information and their right to determine whether such information remains confidential and exclusive right to determine who may collect and/or use such information for marketing purposes and (b) to determine who has access to their computing devices.

298. As such, Defendants cannot viably claim any exception to ECPA liability.

299. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant has intruded upon, intercepted, transmitted,

shared, and used their individually identifiable patient health information (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiffs and the Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' individually identifiable patient health information without providing any value or benefit to Plaintiffs or the Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' individually identifiable patient health information, such as understanding how people use its website and determining what ads people see on its website, without providing any value or benefit to Plaintiffs or the Class Members;

d. Defendant has failed to provide Plaintiffs and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e. The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, test results, and appointments that Plaintiffs and Class Members intended to remain private no longer private.

300. As a result of Defendant's violation of the ECPA, Plaintiffs and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT II**

**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code §§ 630, *et seq.***
**(On behalf of Plaintiffs & the California Class)**

301. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

302. The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

303. CIPA begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code §§ 630.

> California Penal Code § 631(a) provides, in pertinent part: Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500)[.]

304. A defendant must show it had the consent of *all* parties to a communication.

305. At all relevant times, Defendant aided, employed, agreed with, and conspired with Facebook and other third parties to track and intercept Plaintiffs' and California Subclass Members' internet communications while using the Website,

specifically by installing and configuring the Pixel to permit Facebook to eavesdrop on and intercept in real-time the content of Plaintiffs' and California Subclass Members' private communications with Defendant.

306. The content of those conversations included Private Information, such as highly sensitive PHI. Through Defendant's installation and configuration of the Pixels on its Web Properties, these communications were intercepted by Facebook during the communications and without the knowledge, authorization, or consent of Plaintiffs and California Subclass Members.

307. Defendant intentionally inserted an electronic device into its Web Properties that, without the knowledge and consent of Plaintiffs and California Subclass Members, transmitted the substance of their confidential communications with Defendants to a third party.

308. Defendant willingly facilitated Facebook's and other third parties' interception and collection of Plaintiffs' and California Subclass Members' private medical information by embedding the Pixel(s) on the Website, thereby assisting Facebook's eavesdropping.

309. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Pixel falls under the broad catch-all category of "any other manner":

a. The computer codes and programs Facebook and other third parties used to track Plaintiffs' and California Subclass Members' communications while they were navigating the Website;
b. Plaintiffs' and California Subclass Members' browsers;
c. Plaintiffs' and California Subclass Members' computing and mobile devices;
d. Facebook's web and ad servers;
e. The web and ad servers from which Facebook and other third parties tracked and intercepted Plaintiffs' and California Subclass Members'

communications while they were using a web browser to access or navigate the Website;

f. The computer codes and programs used by Facebook and other third parties to effectuate its tracking and interception of Plaintiffs' and California Subclass Members' communications while they were using a browser to visit the Website; and

g. The plan Facebook and other third parties carried out to effectuate its tracking and interception of Plaintiffs' and California Subclass Members' communications while they were using a web browser or mobile application to visit the Website.

310. Defendant failed to disclose that it uses the Pixels to track and automatically and simultaneously transmit highly sensitive personal communications to a third party. Defendant is necessarily aware that these communications are confidential as their Website Privacy Notices acknowledge the confidential nature of PHI and disclaims that it is being shared with unidentified third parties without Plaintiffs' and California Subclass Members' express authorization.

311. The patient communication information that Defendant transmits while using the Pixel and tracking technologies constitutes protected health information.

312. As demonstrated hereinabove, Defendant violates CIPA by aiding and permitting third parties, including Facebook and its agents, employees, and contractors to receive its patients' online communications in real time through its Web Properties without their consent. Facebook specifically receives the content of these communications and understands it, as the FID is assigned by Facebook and Facebook must understand the content in order to process it and link it to individual Users so that Facebook may target advertising to those persons based on their healthcare choices.

313. By disclosing Plaintiffs' and the California Subclass Members' private health information, Defendant violated Plaintiffs' and California Subclass Members'

statutorily protected right to privacy.

314. As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to Plaintiffs and California Subclass Members for treble actual damages related to their loss of privacy in an amount to be determined at trial, or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

315. Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## COUNT III

### VIOLATIONS OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT
### Cal. Civ. Code §§ 56, *et seq.*
### (On behalf of Plaintiffs & the California Subclass)

316. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

317. The California Confidentiality of Medical Information Act, California Civil Code §§ 56, et seq. ("CMIA") prohibits health care providers from disclosing medical information relating to their patients without patient authorization. "Medical information" refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental or physical condition, or treatment. 'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual[.]" CAL. CIV. CODE § 56.05.

318. Defendant is a "provider of health care" as defined by California Civil Code § 56.06(b).

319. Plaintiffs and California Subclass Members are patients, and, as health care providers, Defendant had an ongoing obligation to comply with the CMIA's requirements. As set forth above, device identifiers, web URLs, Internet Protocol (IP) addresses, and other characteristics that can uniquely identify Plaintiffs and California Subclass Members are transmitted from within the State of California to Defendants in combination with patient medical conditions, medical concerns, treatment(s) sought by the patients, and doctors viewed along with the medical specialty of the doctor(s) searched for and viewed by patients. This is protected health information under the CMIA.

320. This private medical information is intercepted and transmitted within the State of California to third parties including Facebook and its agents, employees, and contactors via Defendant's knowing and intentional decision to embed enabling software into its Web Properties.

321. Facebook ID is also an identifier sufficient to allow identification of an individual. Along with patients' Facebook ID, Defendant discloses to third parties including Facebook and its agents, employees, and contactors several pieces of information regarding patient use of its Web Properties including but not limited to the following: patient medical conditions, medical concerns, treatment(s) sought by the patients, and medical specialty of the doctor(s) searched for by patients.

322. The information described above constitutes medical information pursuant to the CMIA because it is patient information derived from a provider of health care regarding patients' medical treatment and physical condition, and this medical information is linked with individually identifying information. CAL. CIV. CODE § 56.05(i).

323. As demonstrated hereinabove, Defendant failed to obtain its patients' authorization for the disclosure of medical information and fails to disclose in their Website Privacy Notice that it shares protected health information with Facebook or other third parties for marketing purposes.

324. Pursuant to CMIA Section 56.11, a valid authorization for disclosure of medical information must be: (1) "Clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization;" (2) signed and dated by the patient or his representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. Accordingly, the information set forth in Defendant's Website Privacy Notice does not qualify as a valid authorization.

325. As described above, Defendant is violating the CMIA by disclosing its patients' medical information to third parties, including Facebook and its agents, employees, and contractors along with the patients' individually identifying information. Accordingly, Plaintiffs and California Subclass Members seek all relief available for Defendant's CMIA violations.

326. Plaintiffs and Class Members seek statutory damages, compensatory damages, punitive damages, attorney fees, and costs of litigation for Defendant's violation(s) of the CMIA.

## COUNT IV

## INVASION OF PRIVACY—CALIFORNIA CONSTITUION ART. 1 § 1
**(On behalf of Plaintiffs & the California Subclass)**

327. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count on behalf of themselves and proposed California Subclass.

328. Plaintiffs and California Subclass Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites

without being subjected to wiretaps without Plaintiffs' and California Subclass Members' knowledge or consent.

329. At all relevant times, by using Facebook's and other third parties' tracking pixel(s) to record and communicate patients' FIDs and other individually identifying information alongside their confidential medical communications, Defendant intentionally invaded Plaintiffs' and California Subclass Members' privacy rights under the California Constitution.

330. Plaintiffs and California Subclass Members had a reasonable expectation that their communications, identity, health information, and other data would remain confidential, and that Defendant would not install wiretaps on its Web Properties to secretly transmit communications to a third party.

331. Plaintiffs and California Subclass Members did not authorize Defendant to record and transmit Plaintiffs' and California Subclass Members' private medical communications alongside their personally identifiable health information.

332. This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications. Moreover, it constitutes an egregious breach of the societal norms underlying the privacy right.

333. As a result of Defendant's actions, Plaintiffs and California Subclass Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

334. Plaintiffs and California Subclass Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages and an injunction that prevents Defendant from engaging in the same or similar conduct in the future.

335. Plaintiffs and California Subclass Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and California Subclass Members for the harm to their privacy interests as a result of the intrusion(s) upon Plaintiffs' and California Subclass Members' privacy.

336. Plaintiffs and California Subclass Members are further entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and California Subclass Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

337. Plaintiffs seek all other relief as the Court may deem just, proper, and available for invasion of privacy under the California Constitution.

## COUNT V

### INVASION OF PRIVACY
### (Intrusion upon Seclusion)
### (On Behalf of Plaintiffs and the Nationwide Class)

338. Plaintiffs repeat and re-allege each allegation contained in the Complaint as if fully set forth herein.

339. The Private Information of Plaintiffs and Class Members consists of private and confidential facts and information that were never intended to be shared beyond private communications.

340. Plaintiffs and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

341. Defendant owed a duty to Plaintiffs and Class Members to keep their Private Information confidential.

342. Defendant owed a duty to Plaintiffs and Class Members not to give publicity to their private lives to Facebook and Google and, by extension, other third-party advertisers and businesses who purchased Facebook's and Google's advertising services.

343. Plaintiffs and Class Members had a reasonable expectation of privacy given Defendant's representations, HIPAA Notice and HIPAA generally. Moreover, Plaintiffs and Class Members have a general expectation that their communications

regarding healthcare with their healthcare providers will be kept confidential.

344. Defendant's unauthorized disclosure of Plaintiffs' and Class Members' Private Information to Facebook and Google, third-party social media, and marketing giants, is highly offensive to a reasonable person.

345. Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' Private Information constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

346. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiffs' and Class Members' privacy because Defendant exceeded its authorization to access Plaintiffs' and Class Members' information and facilitated Facebook's and Google's simultaneous eavesdropping and wiretapping of confidential communications.

347. Defendant failed to protect Plaintiffs' and Class Members' Private Information and acted knowingly when it installed the Tracking Technologies onto its Website because the purpose of the Tracking Technologies is to track and disseminate individual's communications with the Website for the purpose of marketing and advertising.

348. Because Defendant intentionally and willfully incorporated the Tracking Technologies into its Website and encouraged patients to use that Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

349. As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiffs and the Class Members was disclosed to third parties without authorization, causing Plaintiffs and the Class to suffer damages.

350. Plaintiffs, on behalf of themselves and the Class Members, seek compensatory damages for Defendant's invasion of privacy, which includes the value

of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

351. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information is still maintained by Defendant and still in the possession of Facebook, Google, and other third parties and the wrongful disclosure of the information cannot be undone.

352. Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Facebook and Google who, on information and belief, continue to possess and utilize that information.

353. Plaintiffs, on behalf of themselves and the Class Members, further seek injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

## COUNT VI

### UNJUST ENRICHMENT
### (On behalf of Plaintiffs & the Nationwide Class)

354. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

355. This claim is pleaded in the alternative to Plaintiffs' common law claims.

356. Defendant benefits from the use of Plaintiffs' and Class Members' Private Information and unjustly retained those benefits at their expense.

357. Plaintiffs and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

358. Plaintiffs and Class Members conferred a monetary benefit upon

Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used and disclosed this information for its own gain including for advertisement purposes, sale or trade for valuable services from third parties.

359. Plaintiffs and Class Members would not have used Defendant's services or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

360. Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

361. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

362. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

363. As a result of Defendant's conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

364. The benefits that Defendant derived from Plaintiffs and Class Members was not offered by Plaintiffs and Class Members gratuitously and rightly belongs to Plaintiffs and Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts and trade practices alleged in this

Complaint.

365. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Class and appointing Plaintiffs and Counsel to represent such Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

C. For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members:

D. For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.

DATE: January 8, 2026

Respectfully Submitted,

**ALMEIDA LAW GROUP LLC**

/s/ *Matthew J. Langley*
Matthew J. Langley (SBN 342286)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: (773) 554-9354
matt@almeidalawgroup.com

*Attorney for Plaintiffs & the Proposed Class*